**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| LEGAL CAPITAL GROUP, LLC, |
| Plaintiff, |
| v. |
| SEAN R. CALLAGY, THE LAW OFFICES OF SEAN R. CALLAGY, ESQ., LLC, and CALLAGY LAW PC, |
| Defendants. |

**Civil Action No. 20-5124 (JXN) (MAH)**

**OPINION**

**NEALS**, District Judge:

This matter comes before the Court on Plaintiff Legal Capital Group, LLC's ("LCG" or "Plaintiff") motion to dismiss (ECF No. 162) Defendants Sean R. Callagy ("Mr. Callagy"), The Law Offices of Sean R. Callagy, Esq., LLC ("SRC LLC"), and Callagy Law PC's ("Callagy Law"), (collectively "Defendants") First Amended Counterclaim ("FAC") (ECF No. 152) pursuant to Federal Rule of Civil Procedure 12(b)(6).  Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1332(a)(1), 1367, and 1391(b) respectively. The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule. 78.1(b).  For the reasons set forth below, Plaintiff's motion to dismiss is **GRANTED IN PART**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

### A.  The Parties

Plaintiff LCG is a litigation funder company, established in 2010, and headquartered in Florida. (Second Amended Complaint ("SAC"), ¶¶ 1, 4, 29, ECF No. 27; FAC ¶ 2). George Prussin ("Prussin") is LCG's principal, and an alleged "experienced litigation funder[]." (FAC ¶ 2). Prussin

was introduced to the litigation funding industry by Mel Schreiber and his son-in-law, Loren Kleinman." (*Id.* at ¶ 3). Thereafter, Prussin "curated his own portfolio of litigation funds" and was involved in various litigation funder enterprises prior to forming LCG. (*Id.* at ¶¶ 5-8).

SRC LLC is a law firm in Paramus, New Jersey established on November 2, 2005. (SAC ¶ 6; FAC ¶ 1; *see also* Declaration of Kevin W. Weber, Esq. ("Weber Decl."), Ex. A., ECF No. 73-2). Callagy Law is a professional corporation formed in 2015. (Weber Decl., Ex. C., ECF No. 73-2). Plaintiff alleges that Callagy Law is a successor-in-interest or alter ego of SRC LLC, created to evade SRC LLC's debts to the Plaintiff. (SAC ¶¶ 8-13, 63-64, 67-88).

Prussin has known Mr. Callagy since Mr. Callagy was approximately thirteen (13) years old. (SAC ¶ 18). Prussin and Callagy "developed a close familial bond" over the years. (*Id.*).

The alleged debts arise from legal funding contracts. In March 2013, LCG and SRC LLC entered into the "Funding Agreement" related to personal injury ("PI") matters. (SAC ¶ 31, Ex. 1; FAC ¶ 38).

### B. SRC LLC Takes on Additional Personal Injury Matters[1]

In late 2012, Prussin "became the driver of funding large personal injury cases across the United States." (*Id.* at ¶ 17). According to the FAC, "[p]rior to December 2012, neither SRC LLC nor its principal, Sean R. Callagy Esq., were focused on personal injury matters." (FAC ¶ 1). "At the time, SRC LLC's focus was on representing medical providers against insurance companies and on commercial litigation. Although SRC LLC did handle a very small number of personal injury actions at any particular time, it was not a focus of the firm." (*Id.* at ¶ 18).

---

[1] The Funding Agreement defined "PI Matters" as Mr. Callagy and SRC LLC's "portfolio of Personal Injury Matters, . . . including but not limited to representing 11 plaintiffs in the matter known as the Route 54 Rollover." (Ex. 3 Recitals).

2

Additionally, the FAC alleges that "[p]rior to providing funding related to the personal injury actions . . . LCG had provided funding to SRC LLC in another matter involving cancer cases in West Virginia, which settled for multiple hundreds of millions of dollars." (*Id.* at ¶ 13). "As part of this funding, SRC LLC provided a letter to George Prussin and the co-counsel involved in this case, confirming that LCG was not a client of Sean Callagy or SRC LLC." (*Id.* at ¶ 14).

LCG allegedly "provided [personal injury] funding to SRC LLC in December 2012." (*Id.* at ¶ 26). On January 5, 2013, Prussin "sent an email to SRC LLC attorney, Tara McCluskey, pressing her to prepare two agreements . . . and stated that he 'will be keeping Sean busy'" and that "Sean and I are ready to GO. All we want is 2 hard, dedicated years." (*Id.* at ¶¶ 19-20). According to the FAC, after these promises, Prussin purportedly drove communications with the Garcia Law Group in Texas. (*Id.* at ¶ 21).

On January 10, 2013, Mr. Callagy sent an email to Prussin which "outlined the terms of the verbal agreement with LCG" and provided that "Legal Capital . . . will fund the expenses and overhead of the PI business in exchange for its normal rate of return . . . ." (*Id.* at ¶ 22). The email further provided that "[w]e will have expenses in several categories: (1) Overhead – payroll, etc… (2) Expense out lay on cases – experts, travel, etc. . . (3) Separate advances to clients which must be tracked." (*Id.* at ¶ 23). Mr. Callagy cautioned, "George, this is going to be very expensive. I believe it will be very profitable, but it will take time to turn it positive." (*Id.* at ¶ 24). "On January 11, 2013, [] Prussin forwarded this email to Ms. McCluskey, who was not on the original email, with the message 'f y i.'" (*Id.* at ¶ 25).

In the first month of the Funding Agreement, LCG "directly or indirectly paid the Garcia Law Group as cost reimbursement $197,995.39." (*Id.* at ¶ 32). "Additional funding advances occurred in January 2013 prior to the execution of a written agreement between the Parties" in the

total amount of $237,995.39 (*Id.* at ¶¶ 28, 33). One such advance was for the "Las Vegas Elenita Ablao case[,]" which Prussin "was very interested [in] and pressed . . . SRC LLC to secure the representation. (*Id.* at ¶ 29). During this time, the FAC alleged that "Prussin continued to push SRC LLC to prepare agreements" and "became increasingly adamant to formalize the deal," purportedly "express[ing] in an email dated January 29, 2013, . . . that he wanted 'the executed contract between SRC and Legal Capital Group . . NOW'" (*Id.* at ¶¶ 34, 36).

### C.  The Funding Agreement

"Multiple drafts for a written agreement between SRC LLC and LCG were provided from January to March 2013. Mr. Prussin continuously requested changes and amendments be made to the Agreement." (*Id.* at ¶ 37). On March 11, 2013, a draft of the Funding Agreement was completed and executed. (*Id.* at ¶ 38).[2]

The Funding Agreement provided, *inter alia*, that "[t]he Advance(s) received by [Mr. Callagy] and the Firm from LCG will be used for immediate economic necessities or other purposes that [Mr. Callagy] and the Firm deem(s) important" (Declaration of Michael Farina ("Farina Decl.") Ex. 3 ¶ 1, ECF No. 162-6; SAC Ex. 1, ECF No. 27-1), that "LCG shall advance funds to [Mr. Callagy] and [his] Firm on an as needed and monthly basis" (Ex. 3 ¶ 2), and that "additional advances may be made by LCG to [Mr. Callagy] and [his] Firm, at LCG's discretion" (Ex. 3 ¶ 3).

---

[2] The Court properly considers the Funding Agreement as a "document integral to or explicitly relied upon in the complaint." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). *See also Pinkney v. Meadville, Pa.*, No. 21-1051, 2022 WL 1616972, at *2 (3d Cir. May 23, 2022) (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016)) (A court may look beyond the pleadings and "consider 'document[s] integral to or explicitly relied upon in the complaint,' or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'").

The Funding Agreement further provided that LCG would receive a "growth factor" of "2.99% per annum, compounded monthly" on its advances used for operational expenses and "4.99% per annum, compounded monthly" on its advances that are repaid from SRC LLC's attorneys' fees received from the funded cases. (Ex. 3 ¶ 4). LCG's interest was to be paid according to "SCHEDULE A" which was attached to the Funding Agreement. (*Id.*). Additionally, the Funding Agreement provided, LCG's share of any recovery was to be "paid to LCG in full on the date any Proceeds from any PI Matters recovered" and that SRC LLC "will not collect any fee from any PI Matter unless and until LCG shall be reimbursed in full." (Ex. 3 ¶ 5). SRC LLC agreed to "cross-collateralize all PI matters the firm currently has pending and all PI matters it is retained on in the future, whether as counsel or co-counsel, to secure the reimbursement of the Advances made to it by LCG." (Ex. 3 ¶ 6).

According to the signed schedules attached to the Funding Agreement, LCG made advances of $237,995.39 in December 2012, and January 2013, and that additional advances/payments of $203,799.25 were made in March, April, May, and September of 2013. (Ex. 3 at 8-12, 13-21).

### D. LCG's Alleged Breach

The Counterclaim alleges that LCG did not make any additional advances. (FAC ¶¶ 41, 45, 49, 59, 75).

On September 17, 2013, "Ms. McCluskey advised Mr. Prussin the LCG needed to make an 'infusion for expert fees'" in the amount of $50,000. (*Id.* at ¶ 42). Prussin responded by asking for a status update on the cases and "indicat[ed] he had not 'seen any progress.'" (*Id.* at ¶ 43). "A comprehensive update was provided to Mr. Prussin, yet he never made that funding." (*Id.* at ¶ 44).

According to the Counterclaim, "[i]n October 2013, Mr. Prussin would routinely joke about not having money, would be out of a job, and that SRC LLC attorney, Mr. McCluskey's husband would be supporting him." (*Id.* at ¶ 46). By the beginning of 2014, "LCG's failure to provide funding was beginning to create substantial friction." (*Id.* at ¶ 47). "On February 1, 2014, Mr. Purssin confirmed his obligation pursuant to the promises he made that he '. . . need[ed] to come up with some money for a final 2 Fire reports . . .' but no further mon[ey] ever came from LCG." (*Id.* at ¶¶ 48-49). Prussin allegedly acknowledged that "experts were not being paid on cases funded by LCG" and sent an email stating it was "TOTALLY MY FAULT: GEORGE PRUSSIN; NOT Callagy; NOT Tara. TOTALLY MY FAULT !! . . . Just understand . . . any hold-up on 2 fire cases is TOTALLY MY FAULT !!" (*Id.* at ¶ 50). Prussin indicated the lack of funding "would be rectified and LCG's advances would resume. However, they never did." (*Id.* at ¶ 51).

"On March 17, 2014, SRC LLC lawyers received a letter from an expert in one of the LCG-funded litigation regarding overdue invoices. The expert threatened to initiate collection procedures, which could damage the case files they were working on." (*Id.* at ¶ 52). Prussin "began to find a replacement funding company for LCG, enlisting the support of his son, Chad Prussin . . . ." Meanwhile, "Mr. Prussin continued to maintain that it was his fault and urged SRC LLC to not let the three Garcia Law Group cases get away." (*Id.* at ¶ 54).

In July 2014, "Mr. Prussin alerted SRC LLC attorneys that experts were threatening to file suit" and "asked that Mr. Callagy be called and '[Prussin] will straighten [sic] out on friday.'" (*Id.* at ¶ 56).

"In November 2014, Mr. Prussin admitted that he lacked available funds until the Garcia Law Group cases (and another case) were resolved." (*Id.* at ¶ 57).

The Counterclaim alleges that as a result of "LCG's failure to make the additional required funding . . . SRC LLC had been instructed to give up its interest in litigations completely in June 2014 . . . ." and its interest in the Garcia Law Group cases in late 2014 or early 2015. (*Id.* at ¶ 60). SRC LLC also "had to cover the overhead expenses of added employees" as well as "expert fees, expert expenses, employee expenses, and other costs of litigation." (*Id.* at ¶¶ 61-62).

In July 2014, Prussin "communicat[ed] directly with SRC LLC's co-counsel" and advised them that "he wanted 'out' of the funded cases." (*Id.* at ¶ 64). Subsequently, SRC LLC withdrew from cases where possible, located alternative counsel, and diminished the number of PI cases at "substantial losses." (*Id.* at ¶ 65).

Plaintiff initiated this action on April 26, 2020. (ECF 1). On November 20, 2020, Plaintiff filed the SAC. (ECF No. 27). On December 11, 2020, Defendants moved to partially dismiss and strike the SAC. (ECF No. 28). On August 25, 2021, the motion was administratively terminated pending mediation with the Hon. Garrett Brown, Jr., U.S.D.J. (ret.). (ECF No. 44). Mediation was unsuccessful.

On July 18, 2022, Defendants re-filed their partial motion to dismiss and strike Plaintiff's SAC. (ECF No. 73). On July 28, 2022, Plaintiff opposed. (ECF No. 75). On August 8, 2022, Defendants replied. (ECF No. 77).

On January 31, 2023, Defendants filed a motion to dismiss Count One of the SAC. (ECF No. 86). On March 13, 2023, Plaintiff opposed. On March 23, 2023, Defendants replied. (ECF No. 96).

On April 13, 2023, Plaintiff filed a motion for sanctions. (ECF No. 98). On May 1, 2023, Defendants opposed. (ECF No. 103). On May 8, 2023, Plaintiff replied.

On March 12, 2024, the Court held oral argument on all three pending motions. (ECF No. 125). On March 13, 2024, the Court granted Defendants' partial motion to dismiss and strike (ECF No. 73) Plaintiff's SAC as to Counts Three, Four, Five, Seven, Eight, Nine, and Ten, which were dismissed without prejudice. (ECF No. 126). The Court denied Defendants' partial motion to dismiss and strike as to Counts One and Six. (*Id.*). The Court further denied Defendants' request to strike the Second Amended Complaint's ad damnum clause seeking $18 million in damages. (*Id.*). Additionally, the Court denied Defendants' motion to dismiss (ECF No. 86) Count One of the SAC and denied Plaintiff's motion for sanctions (ECF No. 98). (ECF No. 126).

On April 17, 2024, Defendants filed their answer and Counterclaims. (ECF No. 133). On May 29, 2024, Defendants filed Amended Counterclaims. (ECF No. 152).[3]

On July 3, 2024, Plaintiff filed a motion to dismiss Defendants' Amended Counterclaims. ("Pl.'s Br.") (ECF No. 162). On August 5, 2024, Defendants opposed. ("Defs.' Br.") (ECF No. 170). On August 12, 2024, Plaintiff replied. (ECF No. 171). This matter is now ripe for consideration.

## II.    **LEGAL STANDARD**

### A.  **Rule 12(b)(6)**

Rule 8 requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotations and ellipses omitted).  On a Rule 12(b)(6) motion, the "facts

---

[3] On May 8, 2024, Plaintiff filed a motion to dismiss Defendants Counterclaims. (ECF No. 139). Plaintiff's motion was administratively terminated without prejudice due to Plaintiff's noncompliance with Rule IV(A) of the Court's Individual Rules and Procedures which requires the filing of a pre-motion letter. (ECF No. 140). Subsequently, upon reviewing Plaintiff's pre-motion letter (ECF No. 141) and Defendants' response (ECF No. 147) the Court permitted Plaintiff to file its motion and for Defendants to amend their Counterclaims. (ECF No. 148).

alleged must be taken as true" and dismissal is not appropriate where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A complaint will survive a motion to dismiss if it provides a sufficient factual basis to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a complaint is sufficient, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must "assume the[] veracity" of well-pleaded factual allegations and ascertain whether they plausibly "give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citations omitted).

## B. Rule 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). Fraud-based claims, like Defendants' fraudulent inducement counterclaim, are subject to a heightened pleading standard, requiring a plaintiff or counterclaimant to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). For a fraud-based claim, a court may grant a motion to dismiss pursuant to Rule 9(b) if a party fails to plead with the required particularity. *See Frederico v. Home Depot*, 507 F.3d 188, 200-02 (3d Cir. 2007). The level of particularity required is such that a party is provided with sufficient details to be put on notice of the "precise misconduct with which [it is] charged." *Id.* at 200 (citation omitted). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at

issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). This heightened standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

## III.    DISCUSSION

### A.  Whether Counts I, II, and III of Defendants' Counterclaim are Timely

Plaintiff moves to dismiss Counts I, II, and III of Defendants' Counterclaim as untimely. (Pl.'s Br. at 10-13, 15-17, 21-22). Defendants argue the contrary. (Defs.' Br. at 4-11). The Court agrees with Defendants.

Under New Jersey law, there is a six-year statute of limitations for breach of contract (Count I), fraudulent inducement (Count II), and tortious interference (Count III) claims; thus, each type of claim must be brought within six years "after the cause of any such action shall have accrued." N.J.S.A. 2A:14–1; *Peck v. Donovan*, 565 F. App'x 66, 69 (3d Cir. 2012). When asserted as compulsory counterclaims, the statute of limitations is tolled by the filing of the complaint. *See* Fed R. Civ. P. 13(a).

As a threshold matter, the Court determines whether Defendants' counterclaims are compulsory or permissive. A compulsory counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim [] and [] does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1). A permissive counterclaim is one "that is not compulsory." Fed. R. Civ. P. 13(b).

The Third Circuit has instructed courts to consider "whether the counterclaim 'bears a logical relationship to an opposing party's claim.'" *Transamerica Occidental Life Ins. Co. v.*

*Aviation Office of Am., Inc.*, 292 F.3d 384, 389-90 (3d Cir. 2002) (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)).

The Third Circuit has held that a logical relationship exists "where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts." *Vukich v. Nationwide Mut. Ins. Co.*, 68 F. App'x 317, 319 (3d Cir. 2003) (quoting *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961)). Indeed, "the objective of Rule 13(a) is to promote judicial economy, so the term 'transaction or occurrence' is construed generously to further this purpose." *Id.* at 390.

Here, a logical relationship exists between all three of Defendants' counterclaims and Plaintiff's claims; the claims arise from the same transaction or occurrence—the Funding Agreement. Thus, Defendants' counterclaims for breach of contract, fraudulent inducement, and tortious interference are compulsory. *Vukich*, 68 F. App'x at 319 (3d Cir. 2003) (finding breach of contract claim compulsory because "[b]oth lawsuits are primarily concerned with the scope of the parties' permissible actions under the same . . . agreement during the same time period and are interconnected."); *Great Lakes Rubber Corp.*, 286 F.2d at 634 ("Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties," a compulsory counterclaim exists); *Transamerica Occidental Life Ins. Co.*, 292 F.3d at 389 ("The concept of a 'logical relationship' has been viewed liberally to promote judicial economy.").

### i.     Breach of Contract Counterclaim

Since the counterclaims are compulsory, the six-year statute of limitations for breach of contract is tolled upon the filing of the complaint. *See, e.g.*, *Logic Technology Development LLC v. Levy*, No. 17-4630, 2019 WL 6875337, at *2 n.4 (D.N.J. Dec. 17, 2019) (collecting cases). Thus,

since Plaintiff's original pleading was filed on April 26, 2020, the statute of limitations began to run on April 26, 2014. *See R.C. Beeson, Inc. v. Coca Cola Co.*, 07-4806, 2008 WL 4447106, at *6 (D.N.J. Sept. 26, 2008), *aff'd*, 337 F. App'x 241 (3d Cir. 2009) ("[W]hen a party is in continuous breach of a performance obligation, courts find that this continuous failure to honor a contract creates a series of mini breaches wherein a new cause of action perpetually accrues. A continuous breach allows a plaintiff to sue for all damages going back six years even if the original breach occurred more than six years ago."). The FAC contains sufficient allegations of Plaintiff's breaches of the Funding Agreement post-dating April 26, 2014. (FAC ¶¶ 54, 56-60). Contrary to Plaintiff's argument otherwise—that the FAC's attempt to allege additional failures to provide funding in 2014 and 2015 unavailing because the Funding Agreement is not an installment contract—that assertion omits the Funding Agreement's continuing "as needed" funding obligation. (Ex. 3 ¶ 2). While such obligation was not unlimited, and Prussin did not provide funding after September 2013, Defendants' counterclaim allegations plausibly allege additional requests for funds based on costs generated from the cases taken on as a result of the Funding Agreement after April 2014, and a continued expectation of funds based on Prussin's purported promises to deliver funding—a continuing breach. (FAC ¶¶ 48, 54, 56-58). *Richer Mktg. Inc. v. Fairfield Gourmet Foods Corp.*, No. 15-6793, 2017 WL 3641742, at *3 (D.N.J. Aug. 24, 2017) ("This court has denied motions to dismiss asserting continuous breach theory where a breach has occurred after the running of the statute of limitations."); *R.C. Beeson, Inc.*, 2008 WL 4447106, at *6, *aff'd*, 337 F. App'x 241 (3d Cir. 2009).[4] Accordingly, Count I of Defendants' Counterclaim is timely.

---

[4] The Court notes the continuous breach doctrine is not limited to installment contracts. *See*, *e.g.*, *Nat'l Util. Serv., Inc. v. Cambridge-Lee Indus., Inc.*, 199 Fed. Appx. 139, 142 (3d Cir. 2006).

####     ii.    Fraudulent Inducement

Plaintiff argues the accrual date for Defendants fraudulent inducement claim is October 2013, when Defendants should have reasonably discovered Plaintiff's purported fraud. (Pl.'s Rep. Br. at 7-8). Defendants argue they did not become aware of Plaintiff's lack of capitalization until "mid to late 2014[,]" therefore, the accrual date occurred at that time. The Court agrees with Defendants.

The accrual date of a fraudulent inducement claim is "the date of the act or omission that gives rise to the fraud claim, or the date on which the act or omission reasonably should have been discovered." *Kenney v. M2 Worldwide, LLC*, No. 12-1059, 2013 WL 592149, at *4 (D.N.J. Feb. 13, 2013) (citing *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 413 (3d Cir. 1999)).

Plaintiff's argue that the allegations in the Counterclaim demonstrate Defendants should have discovered the alleged fraud, and point to three specific allegations: (1) October 2013, when the funding stopped and "Mr. Prussin would routinely joke about not having money;" (2) February 2014, when Prussin purportedly sent an email which Defendants previously contended constituted a "repudiation" of the Funding Agreement; or (3) March 2014, when "Mr. Prussin began to find a replacement funding company for LCG." (Pl.'s Br. at 8 (citing FAC ¶¶ 46, 50, 53)).

However, the Court finds these allegations not concrete instances where Defendants reasonably should have discovered Plaintiff's purported fraud. The first allegation Plaintiff cites, regarding Prussin "routinely joking about not having money" can be construed as just that— statements made in jest. The second allegation, which according to Plaintiffs, Defendants previously deemed a "repudiation" of the Funding Agreement in prior motion practice, merely alleges that Prussin acknowledged responsibility for experts retained on certain cases not being

paid rather than SRC LLC. (FAC ¶ 50). This email does not give rise to a suspicion of fraud. To the extent the email referenced was a purported "repudiation" by Prussin, subsequent communications detailed in the FAC seem to allege additional promises related to funding after February 2013, which contradicts Prussin's purported repudiation of the Funding Agreement. (FAC ¶¶ 48, 54, 56). The third allegation that in March 2013, Prussin started to find replacement funding and sought help from his son, is more akin to Prussin endeavoring to fulfill his funding promises rather than an indicator of potential fraud. (FAC ¶ 53). Additionally, the nature of the close relationship between Mr. Prussin and Mr. Callagy is relevant in determining the date Plaintiff's purported fraud should have been discovered given the personal connection between the parties minimizes the inclination to view some actions as indicators of fraud.

Construing Defendants' Counterclaim allegations as true, Defendants allege that in July 2014, "Prussin began communicating directly with SRC LLC's co-counsel and telling them that he wanted 'out' of the funded cases" and in November 2014, "Prussin admitted that he lacked available funds." (FAC ¶¶ 57, 64). These allegations are synonymous with "the date on which the act or omission reasonably should have been discovered" because they are affirmative representations from Plaintiff that LCG's funding was inadequate. Thus, the accrual date for Defendants' fraudulent inducement counterclaim is at the earliest July 2014. Accordingly, Defendants' fraudulent inducement claim is timely.

### iii.    Tortious Interference

Defendants' tortious interference claim is similarly timely for the reasons Defendants breach of contract counterclaim is timely. As such, the Court turns to the merits of Defendants' Counterclaims.

### B.  Whether Defendants Counterclaims Plausibly State a Claim

### i.    Defendants Allege a Plausible Breach of Contract Counterclaim

Plaintiff argues Defendants' breach of contract claim should be dismissed because Defendants did not perform under the Funding Agreement and Plaintiff did not breach. (Pl.'s Br. at 13-15). Defendants oppose. (Defs.' Br. at 12-17). The Court agrees with Defendants.

"Breach of contract complaints must establish four elements to survive a motion to dismiss: (1) the parties entered into a contract; (2) the plaintiff performed under the contract; (3) the defendant breached the contract; and (4) the breach caused an alleged loss." *See Moya v. United Airlines, Inc.*, No. 18-14829, 2019 WL 351904, at *2 (D.N.J. Jan. 29, 2019) (citing *Globe Motor Co. v. Igdaley*, 139 A.3d 57, 64 (N.J. 2016)); *see also Dill v. Yellin*, --- F. Supp. 3d ---, No. 22-6116, 2024 WL 1256796, at *4 (D.N.J. Mar. 25, 2024); *Frederico*, 507 F.3d at 203 (citation omitted).

The first element is satisfied; in March 2013, the parties entered into the Funding Agreement. Second, Defendants adequately allege Plaintiff breached the Funding Agreement, LCG was obligated to advance funds to SRC LLC "on an as needed and monthly basis[.]" (Ex. 3 at ¶ 2).[5] The FAC alleges the Funding Agreement's purpose was that LCG would advance funds for "immediate economic necessities or other purposes that SRC and the Firm deem(s) important."

---

[5] The parties dispute the provisions of the Funding Agreement and their accordant obligations. *Compare* (Pl.'s Br. at 14 arguing LCG's funding obligations were discretionary, not "required," and emphasizing paragraph 3 of the Funding Agreement which states, "that *additional* advances *may* be made by LCG . . . *at LCG's discretion*" (citing Ex. 3 ¶ 3)) (emphasis added by Plaintiff), *with* (Defs.' Br. at 12-13 arguing that paragraph 3 related to supplemental funding, a contrary interpretation would render paragraph 2 superfluous and emphasizing paragraph 2 of the Funding Agreement which states, "LCG shall advance funds to SRC [LLC] and the Firm *on an as needed and monthly basis*" (citing Ex. 3 ¶ 2)) (emphasis added by Defendants). Indeed, the parties dispute over the proper interpretation of the Funding Agreement is central to the litigation. The Court finds that the parties differing interpretations suggest ambiguity and thus, better suited to be resolved in discovery. *See Liberty Mut. Fire Ins. Co. v. Harleysville Ins. Co.*, No. 21-7669, 2022 WL 2870201, at *3 (D.N.J. July 20, 2022) ("When a contract is ambiguous, courts deny motions to dismiss so that the parties may obtain discovery in an effort to resolve the ambiguity.") (collecting cases); *CEM Bus. Sols., Inc. v. BHI Energy*, No. 21-18543, 2022 WL 1017098, at *3 (D.N.J. Apr. 4, 2022) (same).

(Ex. 3 at ¶ 1). The FAC further provides that LCG did not provide funding pursuant to the agreement and failed to fund retained experts for the personal injury cases taken on by SRC LLC as contemplated by the Funding Agreement. (FAC ¶¶ 47-51, 56-58). Construing these allegations as true, *Phillips*, 515 F.3d at 228, Defendants sufficiently plead Plaintiff breached the Funding Agreement. Third, while Plaintiff argues Defendants failed to perform under the Funding Agreement because Defendants never reimbursed any of LCG's advances, this assertion is belied by Plaintiff's characterization of the advances as "non-recourse" investments in the SAC. (SAC ¶¶ 65, 153 n.3). Additionally, the repayment provisions of the Funding Agreement were contingent on potential recovery of attorney's fees from the personal injury cases. (Ex. 3 at ¶¶ 1, 2, 5). Plaintiff's advances were investments; Plaintiff provided capital to SRC LLC for litigation of certain personal injury matters and in return Plaintiff would receive a percentage of the proceeds for successful outcomes. (Ex. 3 at Recitals, stating SRC LLC "wish to acquire funds for both Garcia Case Expenses and Operations Expenses to prosecute PI Matters and LCG desires to advance funds to SRC for those Purposes" and "LCG . . . is in the business of advancing funds to law firms . . . in return for the right to receive a portion of the Proceeds contingent upon a successful disputation of the claims, lawsuits, or whether either by settlement, lawsuit, judgment or any other manner[.]"). In short, the Funding Agreement was conditional. Defendants allege and assert that the lack of funding caused Defendants to stop pursuing the contemplated personal injury cases and in turn the cases did not generate a substantial recovery of attorney's fees, thus, Plaintiff did not receive any portion. (Defs.' Br. at 16; FAC ¶ 60). At this juncture, the Court focuses on whether Defendants' Counterclaim allegations taken as true, state a claim for breach of contract—they do— Defendants allege they performed by litigating the PI cases and providing an accounting to Prussin upon request. (FAC ¶¶ 44, 55 "[a] comprehensive update was provided to Mr. Prussin . . . SRC

16

LLC continued to pursue these cases."). The disposition of the PI cases, amounts recovered, and how much, if any, Plaintiff was entitled to under the Funding Agreement are questions to be answered in discovery and adjudicated (in due course; at a later time) afterward. Fourth, Defendants sufficiently allege a loss of unreimbursed expenses and lost profits as a result of Plaintiff's purported breach. (FAC ¶¶ 61, 65, 81). Accordingly, Count I of Defendants' Counterclaim survives.

### ii.    Fraudulent Inducement

Plaintiff seeks to dismiss Defendants' fraudulent inducement counterclaim because it is barred by the economic loss doctrine,[6] Defendants fail to allege a misrepresentation, and the Counterclaim rests on "simple non-performance," which does not satisfy a fraudulent inducement claim. (Pl.'s Br. at 18-19). In opposition, Defendants argue the Counterclaim adequately alleges several misrepresentations from Plaintiff which Defendants reasonably relied upon given Prussin's net worth and experience in prior litigation fund ventures.  (Defs.' Br. at 18-20). Defendants plausibly state a claim.

---

[6] The Court is mindful that "'[t]he economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract.'" *RNC Sys., Inc. v. Mod. Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (quoting *Chen v. HD Dimension Corp.*, No. 10-0863, 2010 WL 4721514, *8 (D.N.J. Nov. 15, 2010)). However, "[f]raud claims can proceed alongside breach of contract claims where there exists fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations." *Barton v. RCI, LLC*, No. 10-3657, 2011 WL 3022238, *7 (D.N.J. July 22, 2011). "The doctrine does not apply . . . when a party uses misrepresentations to induce another into entering an agreement." *JD Glob. Sales, Inc. v. Jem D Int'l Partners, LP*, No. 21-19943, 2022 WL 3053925, at *11 (D.N.J. Aug. 3, 2022) (cleaned up). Here, Defendants' fraudulent inducement claim is not barred by the economic loss doctrine because Plaintiff's alleged misrepresentations occurred prior to the parties entering into the Funding Agreement. *See*, *e.g.*, *Bowers v. Taylor*, No. 23-4222, 2024 WL 3541878, at *5 (D.N.J. June 28, 2024), *report and recommendation adopted*, No. 23-4222, 2024 WL 3540414 (D.N.J. July 25, 2024) (finding economic loss doctrine did not bar fraudulent inducement claim because allegations concerned pre-contractual misrepresentations); *Barton*, 2011 WL 3022238, *7 (finding economic loss doctrine did not bar NJCFA claim because the allegations centered on defendant's pre-contractual representations); *IDT Domestic Telecom, Inc.*, 2023 WL 1360404, at *6 n.5; *see also Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563 (D.N.J. 2002) ("New Jersey federal and state decisions that have permitted a fraud claim to proceed with a breach of contract claim generally appear to have involved a fraud in the inducement of a contract or an analogous situation based on pre-contractual misrepresentations.").

To establish a claim for fraudulent inducement, the following elements must be shown: "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment.'" *Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 309 n. 5 (D.N.J. 2013) (citation omitted).

As set forth above, because fraudulent inducement claims sound in fraud, they are subject to the heightened pleading standard of Rule 9(b). *Frederico*, 507 F.3d at 200.

Here, the Counterclaim alleges Plaintiff made several pre-contractual material misrepresentations of fact, including: (1) January 5, 2013, email from Prussin to an attorney at SRC LLC stating, "will be keeping Sean busy . . . Sean and I are ready to GO. All we want is 2 hard, dedicated years;" (2) describing the venture as a "no-lose" proposition; (3) stating "all expenses" would be covered and Plaintiff would "fund[] . . . as needed;" (4) funding would be available for "years;" and (5) "promising to 'keep Sean busy' for two dedicated years." (FAC ¶¶ 20, 88-90, 93). These allegations state with particularity that Prussin, acting on behalf of Plaintiff, materially represented the fact that funding for PI litigation cases would be available for a minimum of "two years" coupled with the allegation that LCG failed to provide the necessary funding shortly after the Funding Agreement's inception in March 2013, and subsequent lack of funding in 2014 and early 2015. Prussin's own purported statements and actions explicitly demonstrate his intention that SRC LLC rely on his representations. (FAC ¶¶ 29, 34, 36, 54). *See*, *e.g.*, *JD Glob. Sales, Inc.*, 2022 WL 3053925, at *12 (finding alleged promise of lifetime employment a misrepresentation sufficient to plead fraud) (citing *Travelodge Hotels, Inc. v. Honeysuckle Enters.*, 357 F. Supp. 2d 788, 796-97 (D.N.J. 2005) ("Although 'a promise to do something in the future will not normally suffice . . . where a promise is given and the promisor

knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud.'")).

SRC LLC relied on the alleged misrepresentations of funding as a result of Prussin's prior litigation funding experience and the close personal relationship between Mr. Prussin and Mr. Callagy. (SAC ¶¶ 18). Defendants' reliance on the promised funding prompted SRC LLC to alter its practice to litigate the PI cases, hire additional employees, and resulted in additional expenses and lost profits due to LCG's alleged funding failure—detriments to SRC LLC. (FAC ¶¶ 61-62, 65, 98, 102). Thus, these allegations sufficiently allege a claim for fraudulent inducement. *See*, *e.g.*, *IDT Domestic Telecom, Inc. v. Crumpler*, No. 22-1947, 2023 WL 1360404, at \*6 (D.N.J. Jan. 31, 2023) (finding plaintiff adequately plead fraudulent inducement claim based on misrepresentations of fact). The allegations also put LCG on notice of what misconduct Defendants are alleging. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Frederico*, 507 F.3d at 200). Accordingly, Count II of Defendants Counterclaim survives.

### iii.    Tortious Interference

Plaintiff argues Defendants fail to state a claim for tortious interference because despite amendment, the Counterclaim still does not identify a contract between SRC LLC and another party, Defendants do not allege a breach by the contracting third party, and Defendants do not show malice. (Pl.'s Br. at 22-24). In opposition, Defendants assert Plaintiff "ignores the Counterclaims factual allegations" and that a viable claim has been plead. (Defs.' Br. at 22-28).

To state a claim for tortious interference with an existing contract, the following elements must be plead: "(1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference." *Fidelity Eatontown, LLC v. Excellency Enter., LLC*, No.

16-3899, 2017 WL 2691417, at *6 (D.N.J. June 22, 2017) (quoting *DiGiorgio Corp. v. Mendez & Co., Inc.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002)); *Amgro, Inc. v. Lincoln General Ins. Co.*, 361 F. App'x 338, 345 n. 9 (3d Cir. 2010).

"A claim for tortious interference with the performance of a contract must be based, in part, on facts claiming that the interference was done intentionally and with malice." *Micro Image Techs., Inc. v. Olympus Corp. of the Americas*, No. 20-18781, 2022 WL 17132156, at *4 (D.N.J. Nov. 22, 2022). The interference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *Micro Image Techs., Inc.*, 2022 WL 17132156, at *4 (quoting Restatement (Second) of Torts § 766A cmt. e (1979)).

"'[M]alice' does not necessarily require 'ill will,' but rather means that the harm was inflicted by the defendant without justification or excuse." *DiGiorgio Corp.*, 230 F. Supp. 2d at 559.[7] *see also* Restatement (Second) of Torts § 766 cmt. s ("[W]hat is meant is not malice in the sense of ill will but merely 'intentional interference without justification.'"). "Actual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013). The tortfeasor must have actual knowledge of the "specific contractual right." *Id.* "General knowledge of a business relationship is not sufficient." *DiGiorgio Corp. v. Mendez & Co.*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002); *see also* Restatement (Second) Torts § 766, cmt. i (Am. L. Inst.

---

[7] "New Jersey courts have long understood the inquiry to focus on whether defendant's actions amounted to sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated[.]" *DiGiorgio*, 230 F. Supp. 2d at 565 (internal quotation marks and citations omitted). "[T]he analysis hinges upon an evaluation of whether the defendant's conduct bespeaks an improper motivation or intention." *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 421 (D.N.J. 2016).

1979) (requiring that an actor "have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract" to incur liability).

Defendants plead the existence of contractual relationships with the Garcia Law Group, Carrigan McCloskey & Roberson LLP, and Mark Carrigan, Esq. (FAC ¶¶ 108-09, 111 "SRC LLC, were parties to various *contractual relationships* and co-counsel arrangements with third-party law firms and attorneys") (emphasis added). *See IDT Corp v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *9 (D.N.J. Sept. 13, 2022) ("New Jersey law permits a claim for tortious interference with [a] contract to survive a motion to dismiss where a plaintiff alleges the existence of a contract but does not plead specific facts identifying it.") (citing *Syncsort Inc. v. Innovative Routines Intern.*, No. 04-3623, 2005 WL 1076043, *12 (D.N.J. May 6, 2005)). Plaintiff imparts an overly particularized standard related to the required showing for this first element. *See*, *e.g.*, *Syncsort Inc.*, 2005 WL 1076043, *13 ("defendant has alleged the existence of a contract with which plaintiff interfered—the non-disclosure agreements . . . as the Court has already determined, defendant is not required to plead the facts of such contract with the particularity that plaintiff would require.").

Moreover, taking the allegations as true, Plaintiff had actual knowledge of the co-counsel contracts. Indeed, Prussin directly communicated with the Garcia Law Group immediately prior to the implementation of the Funding Agreement, initially directly paid the Garcia Law Group, and in July 2014, Prussin told SRC LLC's co-counsel on cases subject to the Funding Agreement he wanted "out." (FAC ¶¶ 21, 32, 64). Additionally, the "Garcia cases," in which the Garcia Law Group was third party co-counsel, were explicitly named in the Funding Agreement, a primary reason for entering into the Funding Agreement, and specifically contemplated in calculating LCG's return on these cases. (Ex. 3 Recitals, ¶¶ 1, 4). Viewing these allegations in the light most

favorable to Defendants, they demonstrate LCG knew of SRC LLC's co-counsel contractual relationships rather than mere knowledge of a business relationship. Furthermore, it is axiomatic that Prussin knew that the lack of funding would interfere with SRC LLC's ability to adequately litigate the subject PI cases and by extension third party co-counsel who were likewise dependent on such funding. (FAC ¶¶ 54, 56-57). At this juncture, Defendants' allegations are sufficient to establish intentional malicious interference with SRC LLC's third-party co-counsel. *See*, *e.g.*, *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmBH*, No. 10-453, 2010 WL 5239238, at *7 (D.N.J. Dec. 16, 2010) (finding that a defendant's "false and misleading representations" to a third party, impacting plaintiff's business, sufficed to satisfy the malice element in the motion to dismiss stage). "Whether or not Defendant[s] did, in fact, act with 'malice,' is an issue of fact, not appropriately decided on a motion to dismiss." *Id.*

Defendants plausibly allege a loss. Defendants allege that LCG's failure to provide the promised funding "caused significant financial strain on SRC LLC, jeopardizing the firm's ability to fulfill its contractual obligations to co-counsel and other third parties, thereby damaging these established business relationships." (FAC ¶ 113). Defendants also specifically plead that LCG's failure to fund the PI cases "damag[ed] the relationship between SRC LLC and the Garcia Law Group, resulting in SRC LLC having to give up its interest in the cases with the Garcia Law Group in or around late 2014 or early 2015" and that both the Garcia Law Group and Carrigan McCloskey & Roberson LLP "stopped doing business with SRC LLC," causing "lost opportunities, financial losses associated with the inability to pursue or continue litigation, and harm to the professional reputation of SRC LLC and Callagy." (*Id.* at ¶¶ 114-15, 117-18). These allegations show a breach. *Cf. LoanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 237 (D.N.J. 2019)

(dismissing tortious interference with contract claim where plaintiff failed to allege "specific breach").

The loss of these co-counsel contractual relationships as well as the other costs expended sufficiently allege damages from the Plaintiff's purported interference. (*Id.* at ¶¶ 60-62, 65, 114-15).

### iv.    Breach of Release Agreement[8]

Plaintiff moves to dismiss Defendants' fourth counterclaim because the Release Agreement did not include LCG as a party, only Prussin in his individual capacity, therefore, Defendants cannot plead a breach of contract. (Pl.'s Br. at 24-26). Defendants counter that Prussin and LCG "are one in the same for purposes of the Release Agreement" and that Prussin acted on behalf of LCG, which makes LCG a party to the Release Agreement. (Defs.' Br. at 29-31). The Court agrees with Plaintiff.

As set forth above, to a establish a breach of contract claim, the claimant must plead that: "(1) the parties entered into a contract; (2) the plaintiff performed under the contract; (3) the defendant breached the contract; and (4) the breach caused an alleged loss." *Moya*, 2019 WL 351904 at *2 (citation omitted).

The Release Agreement was between "George Prussin and Callagy Law, P.C. and Sean R. Callagy, who are collectively referred to as the parties." (Farina Decl., Ex. 4 at 1, Release Agreement ("RA"), ECF No. 162-7). LCG is not a party. Defendants' arguments to the contrary defy the plain language of the Release Agreement. (*See generally* RA). As such, unlike Defendants' breach of contract claim regarding the Funding Agreement, there is no ambiguity for which

---

[8] The Release Agreement was noted attached to the Counterclaim. However, the Counterclaim relies on the Release Agreement. (FAC ¶ 122-23). Thus, the Court properly considers the Release Agreement as a "document integral to or explicitly relied upon in the complaint." *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426. *See also Pinkney*, 2022 WL 1616972, at *2.

discovery would be beneficial in resolving. *Cf. Liberty Mut.*, 2022 WL 2870201 at *3. Moreover, Defendants' Counterclaim does not allege LCG was a party to the Release Agreement. (FAC ¶ 122). *Cf. Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) ("When the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail."). Accordingly, Count Four is dismissed without prejudice.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's motion to dismiss (ECF No. 162) Defendants' First Amended Counterclaim (ECF No. 152) is **GRANTED IN PART**.  An appropriate Order accompanies this Opinion.

**DATED**: March 31, 2025

**JULIAN XAVIER NEALS**
**United States District Judge**